HENRY KNOWLES v. HENRY B. WILLIAMS *et al.*

No. 9835.

1. CONVEYANCE — *held to be a deed, not a mortgage.* The terms of an instrument purporting to convey land, examined, and *held* to be a deed rather than a mortgage, and sufficient to convey the legal title held by the grantor.

2. NOTICE TO PURCHASER — *purchaser of land bound to know facts appearing in, or suggested by, title-papers.* A purchaser of land must look to the title-papers under which he purchases; and he is chargeable with notice of the facts appearing upon their face, and also with knowledge of all facts suggested therein, and which, with the exercise of reasonable prudence and diligence, he might have ascertained.

3. EVIDENCE EXAMINED — *and held error to withdraw facts from the jury.* On examination of the evidence in the record, it is *held* that the ruling of the trial court, withdrawing the case from the consideration of the jury, was error.

Error from Sumner District Court. Hon. James A. Ray, Judge. Opinion filed May 9, 1897. *Reversed.*

This was an action brought by Henry Knowles against Cassander Williams, Henry B. Williams, her husband, and Francis M. Williams, her son, to recover a tract of land in Sumner County, consisting of about four hundred acres. Prior to December, 1886, the land was owned by the Williamses, but was heavily incumbered. Foreclosure proceedings had been begun, and a judgment of foreclosure had been obtained in one case, amounting to over eight thousand dollars. About that time, the Williamses concluded that there were valuable deposits of silver and gold in their land, and desired to obtain money for the purpose of mining in the land and to pay off judgments and perfect the title thereto. They entered into an agreement with E. T. Peck and A. C. Emmons for the organization of a mining company. The land was to be conveyed to the mining company, which was stocked in the sum of twenty thousand dollars. One-half the stock was to go to the Williamses and the balance to be distributed among the other members of the corporation. Peck and Emmons were to procure eleven thousand dollars upon two promissory notes executed by the Williamses and secured upon their personal property, consisting of horses, cattle and hogs. Provision was made in the agreement for the sinking of shafts and the testing of the mineral ore. Notes were executed, one for nine thousand dollars and another for three thousand dollars, and James S. Warden undertook to negotiate the same. The mining company was organized and the land in controversy conveyed to the company. Afterward, in January, 1887, the land was sold, in pursuance of an order of sale, to James S. Warden for the sum of eight thousand dollars, and, the sale having been confirmed, on February 4, 1887, the sheriff executed a deed of the

land to Warden. Warden was an officer of the First National Bank of Frankfort, Kansas, through which he obtained the money required in this transaction. Money was raised for the purpose of developing the mines and testing the mineral, and some of it used to pay off liens and claims against the Williamses. It was soon discovered that no valuable mineral was in the land, and the mining project was abandoned. Warden took possession of the land and leased it to tenants. On February 24, 1890, Warden and wife executed an instrument of conveyance, transferring the land to the First National Bank of Frankfort, of which the following is a copy :

"This indenture made and entered into by and between James S. Warden of the County of Jackson, State of Missouri, trustee, and Fannie U. Warden, his wife, as parties of the first part, and the First National Bank of Frankfort, Kansas, party of the second part,

"Witnesseth, that whereas, said party of the second part and the Windsor National Bank of Windsor, Vt., were heretofore interested in certain debts due to said banks from Cassander and H. B. Williams, of Sumner County, Kansas, which debts were in part secured upon the real estate hereinafter mentioned and described ; and

"Whereas, there were certain prior liens on parts of said lands, secured by mortgages, which said liens said two banks were compelled, in order to secure their debt, to pay off and discharge ; and,

"Whereas, a part of said real estate was sold at public auction under one of said prior mortgages to one R. B. Upham, thereby cutting off the right and lien of said two banks to so much of said real estate as was purchased by and conveyed to said Upham ; and,

"Whereas, a deed heretofore executed by said parties of the first part to said party of the second part for said lands has been lost or misplaced before the same was recorded in said Sumner County ; and,

"Whereas, it is now desired by the parties hereto

to place the legal and record title to said lands in the name of said party of the second part, so that it may sell the same and apportion the proceeds thereof to said two banks, according to their respective equitable interests therein :

"Now, therefore, in consideration of the premises and the sum of one dollar to him in hand paid, the receipt of which is hereby acknowledged, the said James S. Warden in discharge of his said trust, his said wife joining him, does hereby grant, bargain and sell, confirm and release unto the said party of the second part, the First National Bank of Frankfort, Kansas, all his right, title and interest of, in and to said lands, conveyed to him as the trustee of said two banks, for their convenience, which said lands are situate in the county of Sumner and in the state of Kansas, and are described as follows : Lots 1 and 2 and the south half of the northeast quarter of section 1, in township 34 south, range 3 west; also the south half of the southwest quarter of section 31, township 33, of range 2 west, and lots 1, 2, 3 and 4, in section 6, township 34 south, range 2 west; containing in all 400 acres more or less.

"To have and to hold the same unto the said the First National Bank of Frankfort, Kansas, and to its successors and assigns forever, for the use of said two banks, as aforesaid, so that neither the said parties of the first part nor anyone claiming by, through or under them shall ever have any right or title to, claim or interest in any of the real estate so above described.

"In witness whereof, said parties of the first part have hereunto set their hands this 24th day of February, 1890.        JAMES S. WARDEN,
                                    FANNY U. WARDEN."

One of the several mortgages upon the land was foreclosed in 1888, and upon an order of sale the land was sold to R. B. Upham for the sum of $1,166. In pursuance of this sale a sheriff's deed was made to Upham on August 9, 1889. The mortgage under which the sale was made was prior in point of time to the one under which the sale had been made to

Warden. The First National Bank of Frankfort purchased the land from Upham, and a conveyance of the same was made by Upham to the bank on December 15, 1890. The land was sold for taxes in 1886, and on September 9, 1889, a tax deed was executed by the county clerk to L. F. Stewart. On March 24, 1890, in consideration of the sum of $472, Stewart conveyed the land to the First National Bank of Frankfort, Kansas. In 1891, the First National Bank of Frankfort became insolvent, and the Circuit Court of the United States for the District of Kansas appointed a receiver therefor. That court directed a sale of the real estate owned by the bank, and in September, 1891, the receiver, in pursuance of an order of the court, sold the land in controversy to Henry Knowles for $5,100. Two thousand dollars of the consideration was cash in hand, and $3,100 was payable one year thereafter. The final payment was made, and the deed which was executed by the receiver was approved by the Federal court.

It appears that the Williamses removed the personal property, which was given as security for the promissory notes which they executed, to Missouri ; and that the Windsor Bank of Vermont, to which the notes had been transferred, followed them into Missouri and undertook to recover the property. A replevin action was begun there by the bank to recover the property, but, in some way, the litigation resulted in the defeat of the bank and the Williamses recovered possession of the notes which they had executed. After Knowles purchased the land, he gained possession of the same and made improvements thereon ; but in June, 1892, the Williamses returned and entered into possession of the land, and in February, 1893, Knowles brought the present action to recover the same. At the trial, testimony as to the contracts

15—58 KAN.

and conveyances, and as to the circumstances sur-
rounding the transaction, was offered, after which the
court directed the jury to return a verdict in favor of
the defendants ; which was done. The plaintiff al-
leges error.

*Charles Wilsie, R. R. Vermillion* and *Kos Harris*, for
plaintiff in error.

*W. W. Schwinn*, for defendants in error.

JOHNSTON, J. The trial court appears to have taken
the case from the jury upon the theory that Knowles
had wholly failed to show any title in himself to the
land in dispute. In support of that ruling, it is con-
tended that the deed from Warden to the bank,
through which Knowles claims title, was a mere se-
1. Conveyance held curity, and upon its face showed that the
   to be a deed.    bank had nothing more than a lien upon
the land. We cannot assent to this view. Although
the conveyance from Warden to the bank contains
ambiguous and somewhat inconsistent recitals, they do
not warrant the conclusion that the instrument was in
fact a mortgage. In the deed it is said to be the pur-
pose of the parties thereto to place the legal record-
title to the land in the bank. The legal title to the
land was in Warden, and that title he was competent
to convey. He is named in the instrument as a
trustee, but there is a recital in the deed that he was
trustee of the two banks from which he obtained
the money that was invested in the land. It is re-
cited that, at some past time, the banks were interested
in certain debts due them from the Williamses, which
debts were in part secured upon the land ; but it is not
stated that the debts existed at the time the instru-
ment was executed, and in fact the only secured obli-
gations which the banks held against the Williamses
were the notes, one for nine thousand dollars and the

other for three thousand dollars, and these were secured by mortgages upon personal property, and not upon the land. There is a recital that, for their own protection, the banks were compelled to pay and discharge certain mortgages and liens, and that a part of the land had been sold at public sale under a prior mortgage to R. B. Upham, thereby cutting off the right and lien of the two banks to the real estate purchased by and conveyed to Upham; but there is nothing to show the existence of any mortgage upon the land, made by the Williamses, either to Warden or to the banks. Although the recitals are ambiguous, they do not indicate that the instrument was intended as a mortgage; and we see nothing in them inconsistent with the vesting of the legal title of Warden in the bank. Prior to the execution of this instrument, the Williamses had conveyed all the interest which they held in the land to the mining company. After that transfer the sheriff's deed was made to Warden, and when the instrument in question was executed Warden apparently held the legal title to the land, and was in the possession of the same.

A trust relation is suggested in the recitals, but it is therein declared that Warden is the trustee of the banks. If he purchased the land with the bank's money and took the title in his own name, he would of course hold it as trustee for the bank, and his transfer would give the bank all the title and estate in the land which he acquired. The language used by the grantor manifests an intention to transfer the title to the grantee, and we think the instrument is sufficient at least to transfer the legal title. In addition to this title, the bank had obtained an absolute conveyance from Upham, and the deed executed by him to the bank was an unconditional one. Further than that, a tax deed was issued, after the transaction with the

Williamses, against the validity of which no objection is made. All interest of the holder of the tax title has been conveyed to the bank upon the alleged consideration of $472. The legal title and all the estate acquired by the bank passed to Knowles through the deed of the receiver, which was approved by the Federal court.

While he thereby acquired the legal title, it is claimed that he had valid notice that the Williamses held an interest in the land; and if so, he took it charged with any available equity which they had in it. The vague and ambiguous recitals of the Warden deed suggest a trust relation, the nature of which is not easily understood; and we think they are such as to put a purchaser upon inquiry. He was bound to look to the title-papers under which he purchased, and as Knowles traces his title through this deed, he is chargeable with notice of the recitals therein contained, and with knowledge to which anything on the face of the recitals would legitimately lead him. What the relations of the parties are, cannot be learned from the recitals without the aid of collateral facts and surrounding circumstances; and these being in doubt, the extent of the notice to and the knowledge of Knowles, and the equities of the parties, cannot be determined at this time. It seems that no part of the money paid by those under whom the plaintiff claims title has been paid by the Williamses, nor does it appear that the notes which they gave and secured by mortgage upon chattel property have ever been paid by them. Still, they appear to have secured a return of their notes, and have obtained possession and are claiming the ownership of the land as well.

2. Purchaser bound to know contents of title papers.

Whatever the rights of the parties are, however, we think the plaintiff made a *prima facie* case, and, upon

his proof alone, was entitled to recover. As the equities in the case rested upon vague recitals and contradictory testimony, the court was not warranted in taking the case from the jury. Having reached this conclusion, it becomes unnecessary to examine the other objections made by the plaintiff in error.

3. Error to withdraw facts from jury.

The judgment will be reversed and the cause remanded for a new trial.